# IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF VIRGINIA
### Charlottesville Division

CLERK'S OFFICE U.S. DIST. COURT
AT CHARLOTTESVILLE, VA
FILED

DEC 17 2007

JOHN F. CORCORAN, CLERK
BY: _____
DEPUTY CLERK

SHENANDOAH VALLEY NETWORK,           )
COALITION FOR SMARTER GROWTH,        )
AND LARRY ALLAMONG,                  )
                                     )
            Plaintiffs,              )
                                     )
                                     )          Civil Action No.: 3:07 CV 00066
        v.                           )
                                     )
J. RICHARD CAPKA, ADMINISTRATOR,     )
FEDERAL HIGHWAY ADMINISTRATION       )
400 Seventh Street S.W.              )
Washington, DC 20590                 )
                                     )
        SERVE:  John L. Brownlee     )
                U.S. Attorney for the )
                 Western District of Virginia )
                U.S. Courthouse and Federal )
                  Building           )
                255 West Main Street, Room 130 )
                Charlottesville, Virginia 22902 )
                                     )
                                     )
                with a copy via certified mail to )
                                     )
                Michael B. Mukasey.  )
                Attorney General     )
                U.S. Department of Justice )
                950 Pennsylvania Avenue, NW )
                Washington, DC 20530-0001 )
                                     )
                                     )
MARY PETERS, SECRETARY, UNITED       )
STATES DEPARTMENT OF                 )
TRANSPORTATION,                      )
400 Seventh Street S.W.              )
Washington, DC 20590                 )
                                     )
        SERVE:  Same as above.       )
                                     )
ROBERTO FONSECA-MARTINEZ,            )
VIRGINIA DIVISION ADMINISTRATOR      )

1

```
FEDERAL HIGHWAY ADMINISTRATION,        )
400 North 8th Street, Suite 750                        )
Richmond, Virginia 23219-4825                        )
                                                                    )
        SERVE:   Same as above.                       )
                                                                    )
                              Defendants.                 )
_____)
```

## COMPLAINT FOR DECLARATORY, INJUNCTIVE AND OTHER RELIEF

### I. Introduction

1.   This is an action for a declaratory judgment pursuant to 28 U.S.C. § 2201 and injunctive relief pursuant to 28 U.S.C. § 1651 against Defendants  J. Richard Capka, Administrator of the Federal Highway Administration ("FHWA"), Mary Peters, Secretary of the U.S. Department of Transportation, and Roberto Fonseca-Martinez, FHWA Virginia Division Administrator (hereinafter collectively referred to as "FHWA") challenging the adequacy of compliance with the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq*., prior to approving a Tier 1 Final Environmental Impact Statement ("FEIS") and Record of Decision ("ROD") for the Interstate 81 corridor improvement study in Virginia.  The Tier 1 ROD will be the basis for approving specific projects for Sections of Independent Utility in the I-81 corridor (hereinafter the "I-81 Projects") during the Tier 2 stage.  The FHWA's decision to publish notice of the Tier 1 ROD in the Federal Register for the express purpose of precluding any legal claims relating to Tier 1 decisions also violates Plaintiffs' rights under the Due Process Clause of the Fifth Amendment to the U.S. Constitution, since neither the Tier 1 ROD nor the Federal Register notice specifies whether and to what extent the FHWA will rely on the Tier 1 ROD to preclude consideration of alternatives for the I-81 Projects in the Tier 2 NEPA documents.

2

2. As approved by the FHWA, each of the "build" concepts carried forward for further study in the Tier 1 ROD will result in significant, irreversible, adverse effects on natural, scenic, cultural, historic, and ecological resources and communities, and property owners, by taking 7400 acres of developed land; 1062 acres of prime farmland; between 1600 and 2400 residences; 662 businesses; 1238 acres of civil war battlefields; 33 acres of wetlands; 361 acres of floodplains; 23 miles of streams; and 13 threatened or endangered species, and by stimulating sprawl development; and exacerbating air pollution and greenhouse gases, with attendant impacts on public health and global warming. The I-81 corridor contains some of the most scenic, historic and sensitive rural and natural landscapes in the nation, including the Shenandoah Valley Battlefields National Historic District.

3. Plaintiffs seek a declaratory order pursuant to 28 U.S.C. § 2201 that the FHWA's approval of the Tier 1 ROD is unlawful and invalid, and seek injunctive relief pursuant to 28 U.S.C. § 1651 prohibiting FHWA from providing financial assistance for any individual I-81 Projects that rely on the Tier 1 ROD to justify rejection of reasonable, feasible, and prudent alternatives, and prohibiting the FHWA from approving any funding for individual I-81 Projects and its contractors from contracting for, commencing, or continuing construction of the I-81 Projects, unless and until such time as FHWA has complied with all requirements of applicable law.

## II. Jurisdiction and venue

4. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1367 (supplemental jurisdiction) 28 U.S.C. §§ 2201-2202 (declaratory judgment and further relief), 28 U.S.C. § 1361 (mandamus), and 5 U.S.C. § 702 (right of review under Federal Administrative Procedure Act ("APA")).

3

5. For purposes of the declaratory relief sought in this Complaint, an actual case or controversy within the meaning of 28 U.S.C. § 2201 exists between the parties as to whether the Defendants complied with the requirements of NEPA as part of their approval of the Tier 1 ROD.

6. Venue is proper in this district under 28 U.S.C. § 1391(e) and 5 U.S.C. § 703 for the Western District of Virginia, the district wherein Defendant Fonseca-Martinez resides and is found and where a substantial part of the property that is the subject of this action is situated.

### III. Parties

7. The Shenandoah Valley Network is an unincorporated association whose mission is to link community groups working on land protection, land use, and transportation issues in the six counties of Frederick, Warren, Shenandoah, Page, Rockingham, and Augusta. SVN member groups on the I-81 corridor include the Community Alliance for Preservation ("CAP"), which has 45 members in Rockingham County and Harrisonburg, and the Shenandoah Forum, with more than 40 members in Shenandoah County, and Preserve Frederick, with more than 45 members in Frederick County. The Piedmont Environmental Council ("PEC"), a nonprofit organization incorporated under the laws of Virginia, serves as the fiscal agent for the Shenandoah Valley Network.

8. The Coalition for Smarter Growth ("CSG") is an unincorporated association of over 40 local, regional and national conservation and civic groups, whose mission is to ensure that transportation and development decisions accommodate growth while revitalizing communities, providing more housing and travel choices, and conserving our natural and historic areas. The PEC, a nonprofit organization incorporated under the laws of Virginia, is a member of CSG and serves as the fiscal agent for the CSG.

4

9.  SVN and CSG have been actively involved in community organizing, administrative advocacy, and lobbying to secure adequate consideration of the severe and irreversible impacts of the I-81 Projects to the region's natural, cultural, and historic resources, and in advocating for the consideration of reasonable, feasible, and prudent alternatives that do not involve unacceptable adverse impacts to the area's natural, scenic, and cultural resources, and that would meet the goals of the proposed project.

10.  SVN and CSG and their respective members are within the zone of interests intended to be protected by NEPA.  CSG and SVN and their members use, enjoy, and appreciate the scenic, natural, and ecological resources in the lands that will be traversed by the I-81 Projects. Their interest in using, protecting, and appreciating those historic and natural features is threatened and adversely affected by the Defendants' actions and omissions complained of herein.  These members would thus have standing to sue in their own right.  CSG and SVN and their members are and will continue to be aggrieved and adversely affected by the actions of the Defendants, and they have suffered and will continue to suffer injury in fact due to the Defendants' past, current, ongoing, and prospective failure to comply with the law.

11.  Individual Plaintiff Larry Allamong resides on and owns 32.439 acres of land on the south side of Battlefield Road (State Route 601), on the west side of Interstate 81, in Shenandoah County, Virginia and within the Fisher's Hill battlefield, a critical part of the Shenandoah Valley Battlefields National Historic District, designated by Congress in 1996.  Mr. Allamong's property occupies a portion of the Fisher's Hill battlefield called Ramseurs Hill, which is considered a core area of the battlefield.  Mr. Allamong's property includes all of Shenandoah County Tax Map number 23 (A) 157, and is improved by a circa 1930 Farm House.  Mr. Allamong's property will be taken if I-81 is widened with the addition of four or more lanes

5

between Edinburg (Mile Marker 279) and Interstate 66 (Mile Marker 300) as is planned for in the EIS.

12.   CSG and SVN  and their respective members and individual Plaintiff Larry Allamong have been and continue to be irreparably harmed by the acts and omissions of Defendants as alleged herein, have suffered a legal wrong, and are adversely affected and aggrieved by such acts and omissions within the meaning of the APA, 5 U.S.C. § 702. Plaintiffs' interests herein fall within the zone of interest protected by the laws sought to be enforced in this action.

13.   Defendant J. Richard Capka is Administrator of the Federal Highway Administration and is sued in his official capacity.

14.   Defendant Mary Peters is Secretary of the United States Department of Transportation and is sued in her official capacity.

15.   Defendant Roberto Fonseca-Martinez is Virginia Division Administrator of the Federal Highway Administration and is sued in his official capacity.

16.   Defendants Capka, Peters, and Fonseca-Martinez are responsible for the approval, authorization, environmental review, and administration of federally funded and assisted transportation projects, and are responsible for compliance with NEPA and implementing regulations.

17.   At all relevant times, the Defendants acted in their official capacity and under color of state and/or federal law.

## IV.  Facts

18.   I-81 is an interstate freeway extending 855 miles from Tennessee to New York at the Canadian border serving local, regional, and interstate travel in the eastern United States.  In

Virginia, I-81 extends 325 miles in a north to south direction in western Virginia, and currently consists of a predominantly four-lane, limited access interstate divided highway with two small six-lane cross sections from Mileposts 0 to 7 near Bristol and from Mileposts 72 to 81. I-81 has 91 interchanges in Virginia, which provide local access to numerous cities and towns in Virginia, including Bristol, Radford, Wytheville, Christiansburg, Blacksburg, Roanoke, Salem, Lexington, Staunton, Harrisonburg, and Winchester.

19. On November 6, 2003, the FHWA and the Virginia Department of Transportation ("VDOT") entered into an agreement to to follow a tiered NEPA decision making process for the I-81 Corridor Improvement Study. The Tier 1 decision-making included the issuance of a Tier 1 Draft Environmental Impact Statement ("DEIS") on November 28, 2005, a Tier 1 FEIS on March 21, 2007, and a Tier 1 ROD on June 6, 2007.

20. In 2006, the Virginia General Assembly passed legislation (HB 1581), signed into law by the Governor, which requires VDOT to study multi-state rail as a means of diverting truck traffic off of I-81 ("the I-81 Freight Rail Study"), finding, among other things, that "Interstate Route 81 has been found to be overutilized by commercial truck traffic, more than half of which consists of long-haul through-trucks beginning and ending their trips outside of Virginia," that "the 600-mile Interstate Route 81 Corridor between Knoxville, Tennessee, and Harrisburg, Pennsylvania, may be a suitable market in which to deploy a modern, higher-speed intermodal concept using 'roll on/roll off' technology in the United States" and that "a higher-speed dual-track railway would enable the diversion of a significant portion of the through-truck traffic from interstate highways to rail." The law sets an "objective of maximizing diversion potential to rail and minimizing future Interstate Route 81 highway capacity construction needs."

21. Both the DEIS and FEIS identify the purpose of the project as the need for

7

improvements to I-81 in Virginia to address existing and future capacity and safety conditions on I-81. The DEIS and FEIS show that most of the I-81 mainline operates above the Level of Service ("LOS") standards, except for 57 miles of I-81 that currently have a LOS lower than acceptable (defined as below LOS B for rural areas and LOS C for urban areas), and 91-92 percent of I-81 is projected to have an unacceptable LOS in 2035. I-81 overall has a lower rate of accidents than the state-wide average for Virginia's interstates, but 45 miles of I-81 currently have a higher than the state-wide average rates of accident, and geometric deficiencies in the roadway.

22.   The DEIS and FEIS identified a series of "corridor-length" improvement concepts along the entire 325-mile corridor of I-81 in Virginia as well as improvements to Norfolk Southern Railroad's rail lines in Virginia.

23.   The corridor-length improvement concepts identified in the DEIS and FEIS were: "No build"; "Transportation Systems Management" ("TSM"), consisting of safety improvements, truck climbing lanes, Intelligent Transportation System ("ITS") elements, and Traffic Demand Management ("TDM") measures; four "Rail Concepts" for improving Norfolk Southern Railroad's Shenandoah and Piedmont rail lines in Virginia; five "Roadway Concepts" consisting of adding from one to six lanes and upgraded shoulder widths to each direction of I-81 for its entire length in Virginia; five "Combination Concepts," combining "Roadway Concepts" with the Rail Concepts; and five "Separated Lane concepts." The DEIS and FEIS also evaluated the effects of various tolling options on these improvement concepts.

24. During the initial scoping process, the FHWA decided not to evaluate the alternative of multi-state rail improvements based on an FHWA memorandum dated May 4, 2004, asserting that improvements to privately-owned railroads would be "outside of FHWA's

jurisdiction" and that "we are not aware of any currently available federal highway funding categories that could be used to implement privately owned rail improvements as a result of this study."

25. Both the DEIS and FEIS concluded that "no single corridor-length concept satisfies the needs of I-81 in Virginia without providing more lanes than are needed."

26. Both the DEIS and FEIS concluded that the Rail Concepts would only slightly decrease the capacity needs on I-81 in 2035 and therefore do not satisfy the purpose and need for the project.

27. Both the DEIS and FEIS Transportation Technical Report show traffic volume peaks in the urban areas along the corridor, reflecting local traffic immediately in and around the cities and towns of Winchester, Harrisonburg, Staunton, Roanoke, Salem, Christiansburg, and Bristol. FEIS, Chapter 8, Figure 2-4.  In addition to four new "general purpose lanes," the FEIS also projects that "On sections of I-81 that need two lanes in each direction, the need can be met by different means" including "various operational scenarios can be implemented (e.g., separation of general purpose lanes and truck lanes) that would meet the needs, but would require the construction of up to eight additional lanes to operate efficiently." FEIS, at 5-7

28. Both the DEIS and FEIS concluded that the addition of one lane to I-81 in each direction satisfies the purpose and need for approximately 37 percent of the corridor, while the remainder of the I-81 corridor will require two or more additional lanes in each direction.  The FEIS concluded that "the 'Build' concept that is, therefore, proposed to be advanced into Tier 2 is a non-separated highway facility that involves constructing no more than two general purpose lanes in each direction, where needed, to address 2035 travel demands." FEIS, at ES-xv.

29.  The FEIS acknowledges that the footprints for I-81 and the rail concepts could

potentially affect a number of historic sites, including buildings and structures, historic

districts, battlefields, and archaeological sites, as well as parks and trails. Neither the DEIS

nor the FEIS examines indirect or cumulative impacts on historic properties. *See* DEIS at 5-38,

5-86, 5-87; see also FEIS, at 5-36, 5-85, 5-86. The DEIS and FEIS only quantify the number of

acres of historic properties potentially impacted directly from the alternatives advanced in the

Tier 1 EIS. FEIS, at 5-36; See also FEIS, at Sections 5.6, 5.7, and 5.8. Yet, the Shenandoah

Valley Battlefields Foundation, National Trust for Historic Preservation, and other groups

pointed to the significant number of studies and maps documenting Civil War Battlefields and

other historic resources that would be affected by expansion of the highway. In response, the

FHWA simply dismissed such information, cross-referencing the FEIS's section on

environmental consequences, which does not take a "hard look" at the impacts. *See, e.g.,* FEIS,

at Appendix E – Response 46.6 through 46.16.

 30.  The FEIS then stated that the applicability of Section 4(f) to historic sites would be

evaluated in Tier 2, and alternatives to completely avoid Section 4(f) resources would be

evaluated in Tier 2 prior to the use of any Section 4(f) resources. For Section 4(f) resources

that are particularly constrained because they are located on both sides of I-81, additional

alternatives such as alignment shifts or bypasses will be considered at the Tier 2 stage. FEIS,

at 5-44. The FEIS also defers all consultations required by Section 106 on the National

Historic Preservation Act, 16 U.S.C. § 470f. FEIS, at 5-36.

 31.  Throughout the NEPA process, SVN, CSG, and other commenters urged the

FHWA to consider a composite scenario of targeted safety improvements, local land use and

local road investments, enhanced traffic safety enforcement, and multi-state rail improvements,

as a reasonable improvement concept to address the purpose and need for the project and to avoid or reduce harm to historic, community and environmental resources that would result from extensive widening of the highway.  This composite improvement concept relied on the multi-state rail improvements to divert long-distance freight from trucks to rail, and relied on local road and land use changes to reduce local traffic crowding I-81 in the urban areas. Eleven counties, cities and towns, and 22 civic groups formally endorsed a similar range of alternatives under the rubric of "Reasonable Solutions:  A Six-Point Plan for I-81."  The commenters also urged the FHWA to defer the Tier 1 decisions until the completion of the multi-rail study mandated by the Virginia General Assembly.

32.  On June 6, 2007, the FHWA signed a Tier 1 ROD approving the I-81 Corridor Study.  The ROD made the following decisions:  The ROD stated that the Tier 1 decisions being made were: "the improvement concepts to be advanced; advancing I-81 as a toll pilot project; projects with independent utility and logical termini to be studied in Tier 2; the types of NEPA documents; the location of the corridor for studying alignments in Tier 2; and possible purchase of right-of-way parcels on a case-by-case basis." Tier 1 ROD, at 1-2. The ROD stated that the FHWA does not intend to revisit any Tier 1 decisions during the Tier 2 NEPA process "unless substantial new information arises that is material to these decisions." *Id.*, at 2.

33.  The ROD selected the following improvement concept to advance to the Tier 2 NEPA documents: "a non-separated variable lane highway facility that involves constructing no more than two general purpose lanes in each direction, where needed, to address 2035 traffic demands."  Tier 1 ROD, at 2.  The FHWA advanced I-81 as a toll pilot facility in order to allow tolling to be considered as a possible funding mechanism for improvements to I-81 during the Tier 2 stage. *Id.*  The ROD also identified two areas in which a new corridor on new location

11

would be considered: Milepost 72 to 81 near Wytheville, and Mileposts 243 to 251 in Harrisonburg. *Id.*

34. The ROD identified eight "Sections of Independent Utility" ("SIU") which would be the subject of lane expansion at the Tier 2 stage. The SIUs typically run between major intersecting highways, for example from I-66 south to Route 33 in the center of the City of Harrisonburg. The ROD states that the impacts of the individual SIUs are unknown, therefore the environmental impacts of the SIUs would be evaluated in Environmental Assessments ("EA") during the Tier 2 studies to determine whether the impacts are significant enough to warrant full Environmental Impact Statements. The ROD also advanced a number of short-term improvements independent of the Sections of Independent Utility, including the construction of truck climbing lanes, the extension of exit and entrance ramps, and the installation of guard rails. According to the ROD, these short-term improvements would likely be processed under NEPA as documented Categorical Exclusions.

35. On or about June 18, 2007, notice was published in the Federal Register advising the public that the FHWA's approval of the Tier 1 ROD was final for purposes of 23 U.S.C. §139(l)(1), and that a claim seeking judicial review of the Tier 1 ROD will be barred unless the claim is filed on or before December 17, 2007. Mr. John Simpkins, FHWA environmental manager, is identified as the point of contact for the Federal Register notice. The official I-81 website did not include notification that the FHWA had published this notice in the Federal Register or the date on which the statute of limitations for filing claims seeking judicial review of the Tier 1 ROD would expire.

36. On or about July 20, 2007, in response to a specific inquiry to Mr. Simpkins made by a CSG representative about whether notice of the Tier 1 ROD had been published in the Federal

12

Register, Mr. Simpkins failed to disclose that the Federal Register notice of the Tier 1 ROD had been published, and instead informed CSG's representative that "We typically don't publish a notice of availability for Records of Decision in the Federal Register."

### V. Claims

### COUNT I
(Violation of the National Environmental Policy Act, Evaluation of Alternatives, Impacts)

37.   Plaintiffs repeat and incorporate herein by reference the foregoing allegations.

38.   The National Environmental Policy Act of 1969 ("NEPA"), as amended, establishes that "it is the continuing responsibility of the Federal Government to use all practicable means, consistent with other essential considerations of national policy, to improve and coordinate Federal plans, functions, programs, and resources." 42 U.S.C. § 4332(2)(C).

39.   Among other things, NEPA requires that federal agencies prepare a detailed statement on every proposal for a major federal action that may "significantly affect the quality of the human environment." *Id.*

40.   NEPA further requires that every environmental document must be prepared with objective good faith and must fully and fairly discuss, among other things, the adverse environmental effects of the proposed action and the alternatives to the proposed action which may avoid or minimize these adverse effects. *Id.* §§ 4332(2)(C) and (E).

41.   The environmental document must include the specific information required by the NEPA regulations of the Council on Environmental Quality ("CEQ"). 40 C.F.R. Part 1500, *et seq.* These regulations are binding on all federal agencies. *Id* § 1500.1(a).

42.   The "detailed written statement" required by NEPA is known as an "Environmental Impact Statement" ("EIS"). *Id.* § 1508.11.

43.   The EIS must rigorously explore and objectively evaluate all reasonable alternatives to the proposed action.  *Id.* § 1502.14(a).

44.   The CEQ regulations require that the EIS consider reasonable alternatives even if they are not within the jurisdiction of the lead agency. *Id.* § 1502.14(c).

45.   The CEQ regulations encourage agencies to "tier" their environmental impact statements to eliminate repetitive discussions of the same issues and to focus on the actual issues ripe for decision at each level of environmental review." 40 C.F.R. § 1502.20.

46.   "'Tiering' is appropriate when the sequence of statements or analyses is: . . .  (b) From an environmental impact statement on a specific action at an early stage (such as need and site selection) to a supplement (which is preferred) or a subsequent statement or analysis at a later stage (such as environmental mitigation). 'Tiering' in such cases is appropriate when it helps the lead agency to focus on the issues which are ripe for decision and exclude from consideration issues already decided or not yet ripe." *Id.*. § 1508.28.

47. The FHWA's regulations recognize that a Tier 1 study is an appropriate vehicle for evaluating "mode choice" alternatives such as a "rail concept." 23 C.F.R. § 771.111(g).

48. A multi-state rail improvement concept is a reasonable alternative that would address the need for the project and which can only be given meaningful consideration at the Tier 1 stage.

49. The breakpoints between the selected Sections of Independent Utility may preclude consideration of a local road network and land use improvement alternative during the Tier 2 NEPA studies as a reasonable alternative that would address the need for the project.

50. Defendants failed to take the requisite "hard look" at direct, indirect, and cumulative impacts on historic properties and failed to consider the adverse impacts of increased

14

transportation-related fuel consumption resulting from the I-81 Projects on oil dependence and global climate change

51. Defendants' failure to thoroughly evaluate the multi-state rail concept, either alone or in combination with other improvement concepts, and to take the requisite "hard look" at direct, indirect, and cumulative impacts on historic properties and climate change issues prior to issuing the Tier 1 ROD was arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law. Accordingly, Defendants should be enjoined from any and all activities in connection with the I-81 Projects that may adversely affect Virginia's unique natural, scenic, and historic resources until such time as Defendants have fully complied with NEPA. Unless Defendants are so enjoined, Plaintiffs and their members and the individual Plaintiffs will be irreparably harmed.

## COUNT II
(Violation of the National Environmental Policy Act, Evaluation of Alternatives)

52. Plaintiffs repeat and incorporate herein by reference the foregoing allegations.

53. The CEQ regulations provide that where there are gaps in relevant information or scientific uncertainty in an environmental impact statement, and "the information relevant to adverse impacts is essential to a reasoned choice among alternatives and is not known and the overall costs of obtaining it are not exorbitant, the agency shall include the information in the environmental impact statement." 40 C.F.R. § 1502.22(b).

54. The FHWA's approval of the Tier 1 ROD was premature in light of the fact that VDOT is currently tasked by the Virginia General Assembly with the preparation of the I-81 Freight Rail Study to study multi-state rail as a means of diverting truck traffic off of I-81.

55. In light of the highly relevant information that will be afforded by the I-81 Freight

Rail Study bearing on the reasonableness of a multi-state rail concept, the FHWA should have

evaluated the alternative of postponing approval of the Tier 1 ROD until this study was

completed.

  56. Defendants' failure to thoroughly evaluate the alternative of postponing approval of

the Tier 1 ROD until completion of the I-81 Freight Rail Study was arbitrary, capricious, an

abuse of discretion, and otherwise not in accordance with law.  Plaintiffs will be immediately,

actually, and irreparably harmed unless this Court immediately enjoins Defendants from

proceeding with all activities in connection with the I-81 Projects until such time as Defendants

comply with NEPA and its implementing rules and regulations.

## COUNT III
(Violation of Due Process)

  57. Plaintiffs repeat and incorporate herein by reference the foregoing allegations.

  58. Section 6002 of the Safe, Accountable, Flexible, Equitable Transportation Act: A

Legacy for Users ("SAFETEA-LU") provides that claims arising under Federal law seeking

judicial review of FHWA decisions are barred unless filed within 180 days after publication of

the notice of the decision in the Federal Register. 23 U.S.C. § 139(l)(1)

  59. The FHWA's decision to publish this Federal Register notice under 23 U.S.C. §

139(l)(1), and thereby start the statute of limitations, is discretionary, and the FHWA's decision

to do so depends on a number of "risk management" factors.

www.fhwa.dot.gov/hep/section6002/3.htm.  These factors do not include consideration of

whether the publication of such notice may compel premature litigation, such as in the case of

first-tier or programmatic NEPA documents where the final decision does not approve the

construction of any specific projects.  Nor do these factors include any consideration of the

possible foreclosure of the public's rights to seek judicial review with respect to subsequent agency decisions that do approve the construction of specific projects.

60. The FHWA's publication of the notice of the Tier 1 ROD in the Federal Register under 23 U.S.C. § 139(l)(1) will have the effect of generally barring Plaintiffs from raising claims challenging the FHWA's failure to consider alternatives when specific I-81 Projects (*i.e.*, the Sections of Independent Utility) are considered in the Tier 2 NEPA documents, without affording Plaintiffs notice of what specific claims will be barred at the Tier 2 stage.

61. The Tier 1 ROD fails to specify whether and to what extent the FHWA intends to rely on decisions made in the Tier 1 ROD to preclude consideration of alternatives when the FHWA considers any I-81 Projects during the Tier 2 stage for purposes of any federal law, including but not limited to NEPA, Section 4(f) of the Department of Transportation Act, 23 U.S.C. § 138, and Section 106 of the National Historic Preservation Act, 16 U.S.C. § 470f.   For example, it is unclear whether the FHWA's decision in the Tier 1 ROD not to advance various improvement concepts, and composite concepts, such as rail, TSM/TDM measures, local road network upgrades, and targeted safety improvements will foreclose consideration of these measures at the Tier 2 stage, and whether Plaintiffs will be barred from seeking judicial review of any refusal to consider these measures as alternatives when the FHWA considers any I-81 Projects at the Tier 2 stage.

62. The FHWA's decision to publish notice of the Tier 1 ROD in the Federal Register under 23 U.S.C. § 139(l)(1) may therefore foreclose Plaintiffs' right to seek judicial review of Tier 2 decisions without affording Plaintiffs with meaningful notice of what claims or issues may be precluded by decisions made in the Tier 1 ROD, in violation of the Due Process Clause of the Fifth Amendment to the U.S. Constitution.

63.   Defendants' decision to publish notice of the Tier 1 ROD in the Federal Register was arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law. Plaintiffs will be immediately, actually, and irreparably harmed unless this Court immediately enjoins Defendants from proceeding with all activities in connection with the I-81 Projects until such time as Defendants comply with NEPA and its implementing rules and regulations.

## VI. **Relief Requested**

WHEREFORE, Plaintiffs respectfully request this Court to grant the following relief:

1.   Declare the obligations and duties of Defendants and their employees, grantees, agents, and contractors, to comply fully with the requirements of NEPA and the Due Process Clause prior to acquiring right-of-way, financing or contracting for construction of the I-81 Projects.

2.   Issue temporary, preliminary, and permanent injunctive relief directing all Defendants and their grantees, employees, agents, and contractors, to refrain from any acquisition of right-of-way, financing, contracting, or construction of the I-81 Projects until Defendants have fully complied with the requirements of NEPA and the Due Process Clause, and any other applicable laws.

3.   Award Plaintiffs their attorneys' fees, costs, and disbursements; and

4.   Award such other and further relief as the Court may deem appropriate.

DATED this 17 day of December, 2007.

18

Respectfully submitted,

David S. Bailey, Esquire (Va Bar 24940; DC Bar 455518)
Jeter M. Watson, Esquire (Va. Bar 19448)
Gina M. Pisoni, Esquire (Va Bar 71363)
Environmental Law Group, PLLC
5803 Staples Mill Road
P.O. Box 6236
Richmond, Virginia 23230
Telephone:  804-433-1980
Facsimile:  804-433-1981
email:  dsbailey@igc.org, gmpisoni@gmail.com,
bmwatson3@aol.com

Tammy L. Belinsky, Esquire (Va. Bar 43424)
Environmental Law Group, PLLC
9544 Pine Forest Road
Copper Hill, Virginia 24079
Telephone: 540-929-4222
Facsimile: 540-929-9195
email:  tambel@hughes.net

Andrea C. Ferster (DC Bar 384648)
Attorney at Law
1100 17th Street, N.W. 10th Fl.
Washington, D.C.  20036
(202) 974-5142
(202) 331-9680 (Facsimile)
aferster@railtrails.org


Counsel for Plaintiffs

19