CLERK'S OFFICE U.S. DIST. COURT
AT CHARLOTTESVILLE, VA
FILED

SEP 03 2009

JOHN F. CORCORAN, CLERK
BY
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

SHENANDOAH VALLEY NETWORK, ET AL.,

Plaintiffs,

v.

J. RICHARD CAPKA, ET AL.,

Defendants.

CIVIL ACTION NO. 3:07-cv-00066

MEMORANDUM OPINION

JUDGE NORMAN K. MOON

Seeking declaratory and injunctive relief, Plaintiffs[1] challenge the Federal Highway Administration's ("FHWA") issuance, on June 6, 2007, of a Tier 1 Record of Decision ("Tier 1 ROD" or "ROD") for the Tier 1 Final Environmental Impact Statement ("Tier 1 FEIS," or "FEIS") of the I-81 Corridor Improvement Study (the "I-81 Study," or "the Study"), and the FHWA's decision to invoke a 180-day statute of limitations ("SOL") for claims challenging the decisions rendered in the Tier 1 ROD. The matter is before me now upon consideration of the parties' cross-motions for summary judgment.[2] The motions have been fully briefed and oral

---

[1] Plaintiffs are the Shenandoah Valley Network, Larry Allamong, the National Trust for Historic Preservation in the United States, the Coalition for Smarter Growth, the Rockbridge Area Conservation Council, the Virginia Organizing Project, Scenic Virginia, Inc.; Valley Conservation Council; Sierra Club; and APVA Preservation Virginia. Plaintiffs will be referred to collectively as "Plaintiffs." Plaintiffs named as Defendants in their official capacities the Federal Highway Administrator for the United States Department of Transportation, the Secretary of the United States Department of Transportation, and the Virginia Division Administrator of the Federal Highway Administration. The Interveners are the Commonwealth of Virginia, the Virginia Department of Transportation, and, in their official capacities, the Secretary of Transportation for the Commonwealth of Virginia and the Commonwealth Transportation Commissioner. In general, I will refer to the federal Defendants and the Interveners collectively as "Defendants." When necessary, I will refer to the federal Defendants separately as the "FHWA."

[2] I have the following presently before me: Plaintiff's First Amended Complaint (docket no. 5); Plaintiff's Motion for Summary Judgment (docket nos. 59 & 60); Defendants/Interveners Cross Motion for Summary Judgment and Response to Plaintiffs' Motion for Summary Judgment (docket nos. 64 & 65); Plaintiffs' Memorandum in
(continued...)

arguments have been heard. For the reasons that follow, I will grant Defendants' motion for summary judgment (docket no. 64) and will deny Plaintiffs' motion for summary judgment (docket no. 59), and the case will be dismissed and stricken from the active docket of the Court.

**I.**

**A.**

On June 6, 2007, the FHWA issued a Tier 1 ROD for the Tier 1 FEIS of the I-81 Study. The I-81 Study is a comprehensive assessment of the current and future need for increased capacity and improved safety through the year 2035 along Virginia's 325 mile I-81 corridor. In executing the I-81 Study, Defendants chose to utilize a two-step, "tiered" process, as specifically authorized by the National Environmental Policy Act, 42 U.S.C. § 4321, *et seq.*, ("NEPA"). 40 C.F.R. §§ 1502.20, 1508.28.[3] The first tier involves the preparation of an environmental impact

---

[2](...continued)
Response and Reply to Defendants/Intervenors' [*sic*] Cross Motion for Summary Judgment and Response (docket no. 72); and Defendants Reply to Plaintiffs Memorandum in Response and Reply (docket no. 80). The facts have been adduced from the record. The Court has been provided with a DVD containing the FHWA administrative record, a CD-ROM containing supplemental administrative record materials, and hard copies of the core documents in this case, which include the Tier 1 ROD, the Tier 1 ROD appendices, and the 2-volume Tier 1 FEIS.

[3] Code of Federal Regulations, title 40, part 1502, section 20 (July 1, 2008) states:

> Agencies are encouraged to tier their environmental impact statements to eliminate repetitive discussions of the same issues and to focus on the actual issues ripe for decision at each level of environmental review (§ 1508.28). Whenever a broad environmental impact statement has been prepared (such as a program or policy statement) and a subsequent statement or environmental assessment is then prepared on an action included within the entire program or policy (such as a site specific action) the subsequent statement or environmental assessment need only summarize the issues discussed in the broader statement and incorporate discussions from the broader statement by reference and shall concentrate on the issues specific to the subsequent action. The subsequent document shall state where the earlier document is available. Tiering may also be appropriate for different stages of actions. (Section 1508.28).

Title 40, part 1508, section 28 (July 1, 2008) states:

> *Tiering* refers to the coverage of general matters in broader environmental impact statements (such as national program or policy statements) with subsequent narrower statements or
> (continued...)

-2-

statement ("EIS"), which examines a large land area or a broad set of issues such as "general location, mode choice, and area-wide air quality and land use implications of the major alternatives"; the second tier is more particularized and addresses "site-specific details on project impacts, costs, and mitigation measures." 23 C.F.R. § 771.111(g).

Before issuing the Tier 1 ROD, Defendants provided opportunities for public involvement throughout the Tier 1 NEPA process. The *2003 Process Streamlining Agreement Between the Virginia Department of Transportation and FHWA on the Interstate 81 Corridor National Environmental Policy Act Process* ("Streamlining Agreement") memorializes the tiered process and defines decisions to be made and approvals to be granted at specific intervals related to the environmental study. The Tier 1 FEIS is a product of planning pursuant to that Streamlining Agreement and the efforts of the Virginia Department of Transportation ("VDOT"), which spent over a decade planning and studying ways to improve I-81 in Virginia. Defendants considered the existing and future capacity and safety needs in the I-81 corridor as well as a broad range of alternative corridor-length improvement concepts. After doing so, they determined that a non-separated variable-lane highway facility that would involve constructing no more than two general purpose lanes in each direction, where needed, was the concept that

_____

[3](...continued)
environmental analyses (such as regional or basinwide program statements or ultimately site-specific statements) incorporating by reference the general discussions and concentrating solely on the issues specific to the statement subsequently prepared. Tiering is appropriate when the sequence of statements or analyses is:

(a) From a program, plan, or policy environmental impact statement to a program, plan, or policy statement or analysis of lesser scope or to a site-specific statement or analysis.

(b) From an environmental impact statement on a specific action at an early stage (such as need and site selection) to a supplement (which is preferred) or a subsequent statement or analysis at a later stage (such as environmental mitigation). Tiering in such cases is appropriate when it helps the lead agency to focus on the issues which are ripe for decision and exclude from consideration issues already decided or not yet ripe.

most efficiently addressed the needs of the roadway and minimized the social, economic, and environmental impacts that could result. Defendants advanced that improvement concept to Tier 2.

The Tier 1 ROD announced six final decisions relating to the first tier: (1) the improvement concept advanced to Tier 2 is a non-separated variable-lane highway facility that would involve constructing no more than two general purpose lanes in each direction, where needed, to address 2035 traffic demands, and "[t]he No-Build Alternative will be under consideration for each Tier 2 project"; (2) the I-81 Study would be advanced as a toll pilot facility; (3) for subsequent Tier 2 NEPA analysis, I-81 in Virginia would be divided into eight sections of independent utility ("SIU"), while also advancing several short-term safety and operational improvement projects to Tier 2 independent of the SIU projects; (4) during the Tier 2 NEPA process, Environmental Assessments ("EA") would be initiated for each SIU project, while Categorical Exclusions ("CE") will be initiated for each safety and operational improvement project (and an EA will be initiated for any safety or operational improvement project not meeting the CE criteria found at 23 CFR § 771.117); (5) with two possible exceptions, the corridor location for the Tier 2 NEPA studies will be the existing I-81 corridor; and (6) the Tier 1 EIS is sufficient to support future decisions regarding hardship acquisitions or protective purchases of specific right-of-way parcels on a case-by-case basis.

**B.**

Extending 855 miles from Tennessee to New York at the Canadian border, I-81 is a major trucking corridor, connecting markets in the more densely populated northeastern United States (and Canada) to the mid-Southern states, and it is relied upon for local and regional travel and interstate travel in the eastern United States. In Virginia, I-81 extends 325 miles from the

-4-

Tennessee border to the West Virginia border, passing through 21 cities and towns and 13 counties. Construction of I-81 in Virginia began in December 1957, with the final section completed in 1971.

Although VDOT has made some improvements to I-81, traffic volumes have outstripped the efficacy of those improvements; from 1978 through 2003, travel demands on I-81 more than doubled and, in some locations, nearly tripled, with a considerable portion of traffic being heavy vehicles -- on a daily basis, the percentage of heavy vehicle traffic ranges from 21 to 35 percent. Traffic volumes from 2004 are expected to almost double by 2035, with truck traffic projected to grow at a faster rate than general traffic. The record indicates that, under current conditions, more than 90 percent of the I-81 main-line and approximately 60 percent of I-81 ramps will perform below acceptable levels of service[4] during the evening peak hour peak by 2035.

VDOT safety data from January 2000 to December 2002 indicates that eight places along I-81 have weighted crash scores more than double the statewide average. Many others have crash scores more than 25 percent higher than the statewide score. Some sections of I-81, on both the mainline and the interchanges, do not meet current geometric design criteria (such as vertical clearance, sight distance, the absence of truck climbing lanes, shoulder width, and acceleration and deceleration lanes). These geometric shortcomings, when combined with the traffic demands placed on I-81 (including substantial truck traffic), traffic speed, and weather

---

[4] The term "level of service" ("LOS") defines the operational characteristics of traffic flow along a given highway. A letter grade from LOS A (representing free-flow traffic conditions) to LOS F (representing a forced breakdown in traffic flow) is assigned to a specific segment of the highway. The LOS standard for mainline operations of I-81 is LOS B in rural areas and LOS C in urban areas while the LOS standard for all I-81 ramps is LOS C. The I-81 Study found that under a "no-build" scenario, 295 miles (91 percent) of the 325 mile I-81 mainline in the northbound direction and 299 miles (92 percent) in the southbound direction will operate below the LOS standard by 2035. In addition, under a "no-build" scenario, 66 percent of the I-81 northbound ramps and 58 percent of the southbound ramps will operate below the LOS standard by 2035.

Case 3:07-cv-00066-NKM-BWC   Document 85   Filed 09/03/09   Page 5 of 29   Pageid#: 636

conditions, may contribute to the safety problems along I-81 and are likely to worsen by 2035, as traffic volumes increase and existing geometric conditions remain.

From the spring of 1996 through the fall of 1998, VDOT conducted corridor concept studies to address I-81's capacity, safety, and operational deficiencies and to "gain a complete understanding of current and projected deficiencies and needs along I-81." These Concept Studies were not conducted pursuant to NEPA, were not approved by FHWA, and are not a part of the Tier 1 EIS. The Concept Studies divided the 325-mile corridor into 10 concept study areas. In each area, VDOT evaluated safety, traffic operations, and geometric conditions; forecasted future traffic demands; and identified potential improvements. The Concept Studies examined improvement concepts to include widening the existing highway, making interchange improvements, and preserving the region's natural beauty. They also considered traffic and land use matters unique to the various communities located along I-81.

In addition to the Concept Studies, the Northeast–Southeast–Midwest Corridor Marketing Study (the "Reebie Study"[5]) was commissioned by the Virginia Department of Rail and Public Transportation (the "DPRT"), in coordination with VDOT and the Federal Railroad Administration, to determine whether there was marketplace demand for improved intermodal service in the corridor, i.e., rail and highway, and the level of public investment in freight rail that would be necessary to materially reduce the volume of commercial truck traffic on I-81. The Reebie Study, completed in 2003, found that investments in rail improvements could divert up to 10 percent of freight carried by trucks in the I-81 corridor with a $500 million investment within Virginia only (with a primary focus on the Norfolk Southern Piedmont Line). A more

---

[5] So-titled because it was conducted by Reebie Associates, in cooperation with Wilbur Smith Associates, Woodside Consulting Group, and Atherton, Mease, & Company.

-6-

aggressive multi-state scenario found potential diversions of up to 30 percent in freight traffic (a 12% reduction in total traffic) by 2020, but at a much higher cost ($7.6 billion over several decades).

With the Concept Studies and the Reebie Study as background, interest from private sector firms regarding possible partnership with VDOT under Virginia's Public-Private Transportation Act compelled VDOT to consider more ways to address existing and future needs in the I-81 corridor. Given the great length and area of the I-81 corridor in Virginia, and the range of improvement concepts to be considered, Defendants contemplated, over the course of ten months, how best to approach the NEPA decision-making process. To employ the most efficient method to address corridor-wide issues, on November 6, 2003, Defendants entered into the Streamlining Agreement to tier the NEPA process. The Streamlining Agreement set forth the decisions that would be made at the conclusion of each tier, established time lines, established a conflict resolution process, and affirmed that the Tier 1 process would require selecting an improvement concept, such as adding highway capacity, adding rail capacity, or segregating commercial truck traffic from general purpose traffic, while the follow up Tier 2 process would involve approval of "conceptual design features of the improvements . . . for the components identified in Tier 1." In accordance with FHWA's NEPA regulations, FHWA published a Notice of Intent ("NOI") on November 14, 2003, to advise the public that a Tier 1 EIS would be prepared for the I–81 Corridor Improvement Study in Virginia. 68 Fed. Reg. 64674; 23 CFR § 771.123(a). The NOI explained the nature of the first and second tier decision-making to ensure that affected parties were fully aware of their opportunities to influence outcomes at the various decision points.

-7-

Defendants commenced "scoping" in early 2004. Scoping is a "process . . . used to identify the range of alternatives and impacts and the significant issues to be addressed in the EIS. . . ." 23 CFR § 771.123(b). The scoping process included the general public as well as the appropriate federal, state, regional, and local agencies. Defendants held an agency scoping meeting on February 3, 2004, in Richmond with 16 federal, state, regional, and local agency representatives. In addition, seven public scoping meetings were held on February 10, 11, 12, and 17, 2004, in various locations along the study corridor with more than 350 persons and interest groups in attendance. Information and materials describing the I-81 Study, tiering, and the decisions to be made at the conclusions of Tier 1 were distributed prior to and at the public scoping meetings. The scoping process yielded more than 1,000 comments and questions, which were considered and answered.

The Tier 1 Draft Environmental Impact Statement ("DEIS") was issued on November 28, 2005. A Notice of Availability was published in the Federal Register on December 9, 2005. 70 Fed. Reg. 73233. The DEIS was circulated to federal and state agencies, local governments, interest groups, and other interested parties. Public comments were accepted during the comment period, which was extended for a total of 101 days, beyond the 45-day minimum required by FHWA's regulations. 23 C.F.R. § 771.123(i). Approximately 2,600 comments were received from members of the general public and private organizations in addition to Federal, state, and local resource agencies and regional planning commissions. According to Defendants, each substantive comment was considered and answered. Concurrently with the DEIS, Defendants issued eight technical reports in support of the Tier 1 EIS. These reports and their findings, summarized in the DEIS and FEIS, provided thousands of pages of analysis and documentation of a full range of natural, cultural, and socioeconomic resources as well as

-8-

transportation and traffic conditions. The reports include: the Concept Development and Analysis Technical Report; the Economics Technical Report; the Freight Diversion and Forecast Technical Report; the Toll Impact Study; the Transportation Technical Report; the Historic Properties Technical Report; and the Wetlands and Water Resources Technical Report. Following publication of the DEIS, Defendants conducted six public hearings on April 11-12 and 17-19, 2006 with a total of 1,055 people attending. At the hearings, information about the tiering process, the Study's purpose and need, impacts, tolling, SIU designations, and alternate improvement concepts was provided to the attendees. The FHWA received oral testimony from a total of 315 people at the public hearings.

On March 21, 2007, FHWA issued the Tier 1 FEIS, which identified transportation conditions along I-81, identified a wide range of alternate concepts for improvements, and evaluated potential impacts on social, economic, and environmental resources along the entire I-81 corridor in Virginia. Defendants circulated the FEIS to approximately 680 federal, state and local agencies, interested organizations, and individuals who had submitted substantive comments on the DEIS. In addition, the FEIS was made available for download on VDOT's website, and a Notice of Availability for the Tier 1 FEIS was published in the Federal Register on April 6, 2007. Defendants received 17 comments on the FEIS from governmental resource agencies such as the U.S. Environmental Protection Agency and the U.S. Army Corps of Engineers; from public interest groups such as Plaintiffs in the instant matter, Coalition for Smarter Growth, Shenandoah Valley Network, and the Sierra Club; and from individuals.

The options considered by Defendants included a "no-build" concept. They also evaluated 211 combinations of highway improvements, rail improvements, and transportation systems management ("TSM") strategies under various tolling scenarios. The improvement

-9-

concepts considered included the TSM concept, which encompasses safety improvements, *e.g.*, lengthening acceleration lanes at interchanges, truck climbing lanes, Intelligent Transportation System elements, and Transportation Demand Management measures, *e.g.*, use of park and ride facilities and increased use of carpooling. The evaluation of these alternative improvement concepts was discussed in the Concept Development and Analysis Technical Report and was summarized in the FEIS. Each concept was evaluated by its ability to meet the needs of the Study and by cost. An improvement concept's ability to address the capacity need was based on the number of miles of I-81 that would continue to operate below level of service standards after the concept was built and the number of miles where excess capacity would be provided. The FEIS determined that TSM as a standalone concept did not meet the needs of the Study, but that elements of the TSM could complement other improvement concepts.

Four different rail concepts within Virginia were studied, all of which involved rail lines owned by Norfolk Southern Railroad. The rail concepts were evaluated as standalone concepts and in combination with roadway widening concepts. The FEIS concluded that rail within Virginia as a standalone concept only slightly decreased the capacity needs on I-81 in 2035, and therefore the rail concepts did not meet the purpose and need of the Study. In addition, the FEIS explained that five concepts involving rail in combination with widening I-81 would result in excess capacity in certain sections and insufficient capacity in other sections.

The FEIS evaluated five separated truck lane concepts, segregating commercial truck traffic from general purpose traffic. Separated lane concepts were evaluated with the same toll scenarios as the other concepts, with and without rail concepts, and in combination with the addition of zero, one, and two general purpose lanes in each direction. The FEIS concluded that separated lane concepts would not meet the needs of the Study without adding excess capacity.

Roadway concepts were evaluated as consistent corridor-length concepts, *i.e.*, adding an equal number of lanes to the existing lanes for the entire length of I-81 in Virginia, or uniform corridor-length concepts, *i.e.*, making the number of lanes in each direction equal for the entire length of I-81 in Virginia. The consistent corridor-length concepts included adding 1, 2, or 3 lanes for the entire length of I-81 in Virginia, while the uniform corridor-length concepts included bringing I-81 in Virginia to a uniform 6 or 8 lanes. The FEIS concluded that both the consistent and uniform corridor-length concepts would result in excess capacity in certain sections and insufficient capacity in other sections, and, therefore, would not meet the purpose and need of the Study.

After evaluating the many alternate improvement concepts, the FEIS determined the preferred concept to be a "non-separated highway facility that involves constructing no more than two general purpose lanes in each direction, where needed, to address 2035 travel demands." This variable-lane widening concept is a combination of Add 1 Lane and Add 2 Lanes concepts. In addition, the FEIS concluded that, to complement the variable-lane widening concept, elements of the TSM concept could be advanced as independent, short-term safety and operational improvement projects.

The FEIS proposed that I-81 in Virginia be divided into eight SIUs where detailed Tier 2 environmental studies would be initiated. Based upon traffic exchanges and service demands, the FEIS determined that each SIU is independent, useful, and would stand on its own merits as an independent Tier 2 project. To evaluate potential environmental impacts, the FEIS compared the narrowest project footprint that could meet the needs of the Study with the widest project footprint. Potential impacts were calculated by superimposing the footprints over the Geographical Information System data available for each resource. The FEIS discussed

-11-

potential land use changes, displacements, and economic effects, as well as potential impacts to natural resources. The FEIS also discussed conceptual mitigation measures for certain resources that potentially could be impacted.

The Tier 1 ROD was issued on June 6, 2007 and set forth the decisions described heretofore, as well as conceptual mitigation and minimization measures. Following issuance of the Tier 1 ROD, FHWA published a Notice of Final Agency Actions in the Federal Register on June 18, 2007. 72 Fed. Reg. 33555. The Notice advised the public of the specific decisions made at the conclusion of Tier 1, that the Tier 1 decisions would form the basis of subsequent tier proceedings, that the decisions were final, and that judicial review of the Tier 1 decisions would be barred unless filed within 180 days from the date of the Federal Register Notice of Final Agency Actions.

When the Commonwealth is ready to proceed with an individual Tier 2 SIU Project, an EA will be initiated to provide site-specific, detailed analysis of the impacts associated with the proposed project. An EA is a concise NEPA document designed to provide sufficient information and analysis for FHWA to determine the impacts of an action. 40 C.F.R. § 1508.9. EAs are prepared when the significance of the impacts is unknown. If the EA demonstrates that no significant impact on the human environment will result from the Tier 2 SIU Project, FHWA may issue a Finding of No Significant Impact. On the other hand, if the EA demonstrates that a significant impact will result, Defendants will initiate an EIS for that Tier 2 SIU Project.

## C.

In May 2006, the Virginia General Assembly directed Virginia's Secretary of Transportation and the Rail Advisory Board to conduct a feasibility study (the "I-81 Freight Rail Study") to identify improvements to the rail infrastructure for at least 500 miles and identify

-12-

funding mechanisms needed "to divert the maximum amount feasible of the long-haul, through-truck freight traffic to intermodal rail" in the I-81 corridor. *See* 2006 Virginia Laws Ch. 934 (H. 1581) ("Chapter 934"). Chapter 934, subtitled "An Act to determine conditions necessary to divert truck freight from Interstate Route 81," did not establish a date for the completion of the I-81 Freight Rail Study, directing only that it be completed "as quickly as reasonably possible" and disseminated "to the Governor, members of the General Assembly, and the public." *Id.*

When the instant motions were heard, Virginia's Department of Rail and Public Transportation (the "DRPT"), whose responsibilities include working with the railroad companies to improve freight operations, had initiated but not completed the I-81 Freight Rail Study, and apparently there is no projected date for completion of the study. The I-81 Freight Rail Study is independent of the Tier 1 EIS and its supporting technical reports. While a rail concept was not advanced into Tier 2, the Tier 1 FEIS noted that if funded rail improvements emerge from the I-81 Freight Rail Study, FHWA and VDOT would evaluate the effects of those rail improvements on the projections of future travel demand along I-81 as appropriate during Tier 2.

## II.

### A.

NEPA requires that, when a major federal action "significantly affect[s] the quality of the human environment," the responsible federal agencies must prepare a detailed statement discussing the proposed action's environmental impact as well as alternatives to the proposed action. 42 U.S.C. § 4332(2)(C). "NEPA imposes no substantive environmental rules," instead creating procedures whereby agency officials must "assess and consider the environmental consequences of their proposed actions." *New River Valley Greens v. U.S. Dept. of Transp.*, 161

-13-

F.3d 3 (Table), 1998 WL 633959 at *2 (4th Cir. 1998). Claims arising under NEPA are subject to judicial review pursuant to the Administrative Procedures Act ("APA"). *Ohio Valley Environmental Coalition v. Aracoma Coal Co.*, 556 F.3d 177, 189 (4th Cir. 2009). The standard of review "is a narrow one" and focuses on whether the agency actions are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A); *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416 (1971); *Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 378 (1989). The Court must ask "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Id.* In the context of NEPA, this review prohibits a court from "substitut[ing] its judgment for that of the agency as to the environmental consequences of its actions." *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n. 21 (1976). A court is only to assess whether the agency's decision is "within the bounds of reasoned decision making." *Baltimore Gas & Electric Co. v. Natural Resources Defense Council*, 462 U.S. 87, 105 (1983); *see also Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council*, 435 U.S. 519, 555 (1978). As the United States Court of Appeals for the Fourth Circuit has explained:

> In reviewing [agency] action, we bear in mind that the Act, like other environmental statutes, requires balancing conflicting priorities-in this case, water conservation, private compliance costs, state regulatory interests, and the safety of public water systems. Accordingly, we do not "sit as a scientific body, meticulously reviewing all data under a laboratory microscope." *Natural Res. Def. Council*, 16 F.3d at 1401. Nor is it "for the judicial branch to undertake comparative evaluations of conflicting scientific evidence." *Natural Res. Def. Council v. EPA*, 824 F.2d 1211, 1216 (D.C. Cir. 1987). Rather, [the agency] must "explain its course of inquiry, its analysis, and its reasoning," and show a rational connection between its decision-making process and its ultimate decision. *Natural Res. Def. Council*, 16 F.3d at 1401; *see also Natural Res. Def. Council*, 824 F.2d at 1216 ("Our review aims only to discern whether the agency's evaluation was rational.").

*Manufactured Housing Institute v. U.S. Environmental Protection Agency*, 467 F.3d 391, 398-99

(4th Cir. 2006). *See also Hughes River Watershed Conservancy v. Johnson*, 165 F.3d 283, 288 (4th Cir. 1999) ("Although our inquiry into the facts is to be searching and careful, this court is not empowered to substitute its judgment for that of the agency.").

B.

Federal Rule of Civil Procedure 56(c) provides that a court shall grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986). If both parties have moved for summary judgment, a court should consider "each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law." *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003). When reviewing the decision of an administrative agency, a motion for summary judgment "stands in a somewhat unusual light, in that the administrative record provides the complete factual predicate for the court's review." *Krichbaum v. Kelley*, 844 F. Supp. 1107, 1110 (W. D. Va. 1994). Therefore, a movant's "burden on summary judgment is not materially different from his ultimate burden on the merits." *Id.* The "merit of the administrative decision is to be determined exclusively on the administrative record," *Lun Kwai Tsui v. Attorney General*, 445 F. Supp. 832, 835 (D. D.C. 1978), and the Court need not – indeed, may not – "find" underlying facts. Rather, the only issues presented are issues of law. *Celotex*, 477 U.S. at 322; *Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 883 (1990).

III.

A.

The First Amended Complaint contains three Counts, summarized as follows:

-15-

• Count I (styled as "Violation of National Environmental Policy Act, Evaluation of Alternatives, Impacts") challenges Defendants' use of tiering in the development of the I-81 improvement plan, alleging that the tiering concept is a subterfuge to avoid compliance with NEPA. Plaintiffs charge that a multi-state rail improvement concept is a reasonable alternative that Defendants failed to thoroughly evaluate, and that improvement concepts such as "the TSM alternative and/or targeted safety improvements, local land use and local road improvements . . . should have been advanced to the Tier 2 stage." Plaintiffs assert that Defendants failed to "take the requisite 'hard look' at direct, indirect, and cumulative impacts on historic properties, and on human health and the environment, including Shenandoah National Park, from air pollution" as well as the project's contribution to global warming and oil dependence.

• Count II (styled as "Violation of National Environmental Policy Act, Evaluation of Alternatives") alleges that Defendants violated NEPA by prematurely approving the Tier 1 ROD without waiting for the completion of the I-81 Freight Rail Study to fully assess the feasibility of multi-state rail as an alternative to the improvement concepts advanced in Tier 1. Plaintiffs specifically charge that "Defendants' failure to thoroughly evaluate the alternative of postponing approval of the Tier 1 ROD until completion of the I-81 Freight Rail Study was arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law."

• Count III (styled as "Violation of Due Process, 42 U.S.C. §1983") charges that Defendants' publication of the Tier 1 Statute of Limitations Notice in the Federal Register "will have the effect of generally barring Plaintiffs from raising claims challenging the FHWA's failure to consider alternatives when specific I-81 projects . . . are considered in the Tier 2 NEPA documents," and thus violates Plaintiffs' right to judicial review of those decisions.

On October 10, 2008, the parties filed with this Court a joint Stipulation and Agreement (docket no. 56) for the following purposes: identifying "those decisions which constitute 'final agency action' as a result of the Tier 1 NEPA process and which cannot be challenged after December 17, 2007"; to "preserve the plaintiffs' right to challenge those decisions which are made at the end of the Tier 2 NEPA process"; and to "eliminate or narrow counts in the pending litigation or settle the entire matter." The Agreement included a Stipulation of Dismissal with prejudice as to Count I and paragraphs 54 to 58, inclusive, of the First Amended Complaint. In

view of the dismissal of Count I, the remaining issues are limited to those set out in Counts II and III of the First Amended Complaint.

## B.

NEPA ensures that agencies consider the environmental impact of decisions regarding "major federal actions," and requires agencies proposing projects likely to "significantly affect[] the quality of the human environment" to take a "hard look" at the environmental effect of the projects. 42 U.S.C. § 4332(2)(C); *Kleppe*, 427 U.S. at 410 n. 21 ("[t]he only role for a court is to ensure that the agency has taken a 'hard look' at environmental consequences") (citation omitted). NEPA is "essentially procedural and does not mandate particular consequences." *Strycker's Bay Neighborhood Council, Inc. v. Karlen*, 444 U.S. 223, 227 (1980); *see also Vermont Yankee Nuclear Power Corp.*, 435 U.S. at 548 (NEPA does not pre-ordain any environmental result). If the decision is "fully informed" and "well-considered," it is entitled to judicial deference, and a reviewing court should not substitute its own policy judgment for the agency's. *Natural Res. Def. Council, Inc. v. Hodel*, 865 F.2d 288, 294 (D.C. Cir. 1988).

NEPA requires federal agencies to "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. § 4332(2)(E). An EIS must "[r]igorously explore and objectively evaluate all reasonable alternatives" and must explain why it has eliminated an alternative from detailed study, 40 C.F.R. § 1502.14(a); the agency must consider a "no action" alternative, *id.* § 1502.14(d); and the agency must designate a "preferred" alternative, *id.* § 1502.14(e). The Court's task is to determine whether the agency considered the relevant factors and articulated "a rational connection between the facts found and the choice

-17-

made." *Baltimore Gas & Elec. Co.*, 462 U.S. at 105; *Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.*, 419 U.S. 281, 285-286 (1974).

Procedures for implementing NEPA are set forth in regulations promulgated by the Council of Environmental Quality ("CEQ").[6] The CEQ's NEPA regulations encourage agencies to tier their environmental analyses in order to streamline and focus the review process. 40 C.F.R. § 1502.20 ("Whenever a broad [EIS] has been prepared . . . the subsequent statement or environmental assessment need only summarize the issues discussed in the broader statement and incorporate discussions from the broader statement by reference and shall concentrate on the issues specific to the subsequent action."). An EA may be tiered to an earlier EIS "to eliminate repetitive discussions of the same issues and to focus on the actual issues ripe for decision." *Id.* The Tier 1 EIS considers broad scale issues such as "general location, mode choice, and area-wide air quality and land use implications of the major alternatives" while a second tier EA may address "site-specific details on project impacts, costs, and mitigation measures." 23 C.F.R. § 771.111(g). In a tiered analysis, the second tier EA incorporates discussions from the EIS by reference. 40 C.F.R. § 1502.20.

Plaintiffs allege that the issuance of the Tier 1 ROD was in violation of NEPA because Defendants issued the ROD on June 6, 2007, rather than postpone the ROD and await the completion of the I-81 Freight Rail Study, initiated by the Virginia DRPT, and which apparently is currently ongoing. I find that Defendants' consideration of alternatives was reasonable, thorough, and compliant with the requirements of NEPA and the APA. The Tier 1 ROD

---

[6] *See* 40 C.F.R. Part 1500. FHWA's NEPA regulations are set forth at 23 C.F.R. § 771, and additional guidance for preparing NEPA documents is contained in FHWA's Technical Advisory T-6640.8A; however, there is no guidance in this Technical Advisory regarding tiering.

discloses an exhaustive process, spanning several years and a great array of data, evaluating the feasibility and the consequences -- including, *inter alia*, environmental and economic consequences -- of a range of alternatives, and it is clear that the FHWA gave the requisite "hard look," sufficiently "explain[ing] its course of inquiry, its analysis, and its reasoning, and show[ing] a rational connection between its decision-making process and its ultimate decision." *Manufactured Housing Institute*, 467 F.3d at 399 (internal quotation omitted). The decision not to await the completion of the Virginia DRPT's I-81 Freight Rail Study is well-within the bounds of reasoned decision-making. The alternative Plaintiffs propose, postponing the Tier 1 ROD indefinitely, would not satisfy the I-81 Study's purposes and needs.[7]

The consideration of alternatives is the "heart" of an analysis under NEPA and agencies are obligated to evaluate all reasonable alternatives to a proposed action. 40 CFR § 1502.14. An alternative is reasonable only if it will bring about the ends of the federal action." *Citizens Against Burlington Inc. v. Busey*, 938 F.2d 190, 194-95 (D.C. Cir. 1991); *see also City of Alexandria v. Slater*, 198 F.3d 862, 869 (D.C. Cir. 1999)(a "'reasonable alternative' is defined by reference to a project's objectives"). In light of the preceding summary of the facts, the rejection of alternate improvement concepts -- the rejection of a) the rail concepts considered in the Tier 1 FEIS and b) the notion of postponing the Tier 1 ROD pending the Virginia DRPT's I-

---

[7] Moreover, FHWA's NEPA regulations contemplate that significant new information may arise new after the issuance of a ROD and during the pendency of major Federal action. *See* 23 CFR § 771.129. In those instances, FHWA may conduct an internal reevaluation to determine the significance of new information and whether or not it will cause significant environmental impacts; if that reevaluation reveals that the NEPA document remains valid, "no additional documentation is required." *Price Road Neighborhood Assn. v. U.S. Dep't of Transp.*, 113 F.3d 1505, 1512 (9th Cir. 1997). This treatment of significant, new Post-EIS information has been upheld by the courts. *See Piedmont Environmental Council v. U.S. Dept. of Transp.*, 159 F. Supp. 2d 260, 270-71 (W.D. Va. August 21, 2001) (citations omitted) ("In order to make the initial determination about whether a change or new information meets the threshold of 'significance' or 'uncertainty' needed to require further environmental documentation, an agency may use 'non-NEPA' documents such as the Reevaluation employed by the defendants").

-19-

81 Freight-Rail Study -- was appropriate because the proposed concepts did not meet the purposes and needs of the Study. "When the purpose is to accomplish one thing, it makes no sense to consider the alternative ways by which another thing might be achieved." *City of Angoon v. Hodel*, 803 F.2d 1016, 1021 (9th Cir. 1986). Defendants need not consider alternatives that offer only modified efficiency. *Young v. General Services Admin.*, 99 F. Supp. 2d 59, 69 (D. D.C. 2000). "[I]t is simply a non sequitur to call a proposal that does not 'offer a complete solution to the problem' a 'reasonable alternative.'" *City of Alexandria*, 198 F.3d at 869.

The ROD documents FHWA's Tier 1 decision to advance a variable-lane widening concept to Tier 2 for further analysis, and the ROD sets forth the rationale for that decision. The Tier 1 FEIS provides in-depth descriptions of each alternate improvement concept considered and explains why all but the selected improvement concepts failed to meet the purposes and needs of the I-81 Study. The FEIS also explains why the variable lane widening concept would most efficiently address the 2035 travel demands on I-81. Chapter three of the FEIS evaluates each alternate improvement concept based on its cost and its ability to meet the purpose and need of the Study. Given the projected operational performance of the alternate improvement concepts in 2035, the FEIS determined that the rail concepts, the TSM concept, concepts adding a uniform number of lanes, combination rail and widening concepts, and separated lane concepts would not meet the purpose and needs of the I-81 Study.

There is nothing in NEPA and no precedent that suggests that Defendants are required to wait for a state agency to complete its completely separate study before issuing a ROD. Nor does NEPA require the Defendants to accept the input or suggestions of other agencies or conduct additional studies in response to comments. NEPA only requires that the Defendants

-20-

consider and respond to the comments of other agencies. The administrative record indicates that Defendants have complied with this mandate.[8] The CEQ's NEPA regulations require agencies to discuss only alternatives that are feasible or reasonable. 40 C.F.R. §§ 1502.14(a)-(c), 1508.25(b)(2). Here, deferring issuance of the Tier 1 FEIS and ROD would not meet the purpose and need for the study, therefore it is not reasonable. The suggested "alternative" of postponing issuance of the FEIS is simply not an alternative within the meaning of the NEPA regulations, which describe "alternatives" in the context of evaluating proposed major Federal actions.[9] As "compelling" reasons why Defendants should postpone issuance of the Tier 1 FEIS and ROD, Plaintiffs argue that the "Freight Rail Study will offer substantial insight into the question of whether and to what degree multi-state rail can be used to address the transportation needs within the I-81 corridor. . . ."[10] However, it is not possible to prejudge or rely upon the

_____

[8] For example, Plaintiffs contend that the 2006 Commonwealth Transit Board ("CTB") Resolution concerning I-81 represented the CTB's "opposing view" and that the Resolution directed Defendants to defer issuance of the ROD pending completion of the Freight Rail Study. Plaintiffs maintain that Defendants failed to address the CTB's comments and the comments of others who urged Defendants to "defer finalizing the Tier 1 NEPA studies until the completion of the I-81 Freight Rail Study" and requested that "the Tier 1 and Tier 2 NEPA studies incorporate the findings of the I-81 Freight Rail Study." However, my review of the CTB Resolution indicates that it did not present an "opposing view" but rather that it endorsed Defendants' approach to the I-81 Study and the Study's findings. Commenters suggested that Defendants await the completion of the I-81 Freight Rail Study in order to advance a multi-state rail concept, and Defendants responded, explaining a) their rationale for eliminating multi-state rail from further consideration, and b) that the I-81 Freight Rail Study might be considered during Tier 2. The Tier 1 EIS and ROD demonstrate that a multi-state freight rail concept would not meet the purpose and need of the I-81 Study and, therefore, was properly dismissed from detailed analysis during the scoping phase. The FEIS determined that, "even if 100% of the trucks were removed from I-81 in Virginia and their freight put onto rail, the majority of I-81 – including seven of the eight SIUs – would still need additional highway lanes." Awaiting completion of the Freight Rail Study would not have changed the reasonable conclusion that a rail concept would not adequately alleviate traffic congestion and thereby eliminate the need for improvements on I-81.

[9] In support of their argument that postponing issuance of a ROD is an "alternative" within the meaning of NEPA, Plaintiffs cite FHWA's prior NEPA regulations at 23 C.F.R. § 771.18(j); however, § 771.18 is no longer in effect, and was no longer in effect at the time the ROD was issued.

[10] Plaintiffs add that "incorporating these findings in the I-81 NEPA studies may serve as an impetus for securing funding for this concept, and encouraging states such as Tennessee to explore cooperative programs to study rail (continued...)

-21-

findings of a study that has not yet been completed or released, and the Tier 1 NEPA studies have already established that a multi-state freight rail concept will not meet the purpose and need of the Study. Moreover, Defendants are not required by NEPA to await additional studies; indeed, contrary to Plaintiffs' contentions, NEPA does not require agencies to articulate "compelling" reasons for the decisions made. The question before me is not whether or not Defendants had "compelling" reasons but whether or not their "decisions are founded on a reasoned evaluation 'of the relevant factors.'" *Marsh*, 490 U.S. at 378 (quoting *Citizens to Preserve Overton Park, Inc.*, 401 U.S. at 416. NEPA does not require the Defendants "to wait for other agencies to complete their studies, or to accept the input or suggestions of other agencies." *Arkansas Wildlife Federation v. U.S. Army Corps of Engineers*, 431 F.3d 1096, 1101 (8th Cir. 2005) (internal citations omitted); *see also South Louisiana Environmental Council, Inc. v. Sand*, 629 F.2d 1005, 1017 (5th Cir. 1980). It is Defendants' prerogative "to decide which comments of other agencies are of value to its projects." *Id.* (citing *Citizens Against Burlington, Inc.*, 938 F.2d at 201). An EIS must have terminal facilities. *Environmental Defense Fund, Inc. v. Hoffman*, 566 F.2d 1060, 1068 (8th Cir. 1977) (citing *Natural Resources Defense Council v. Callaway*, 524 F.2d 79, 88 (2nd Cir. 1975); *Sierra Club v. Froehlke*, 534

---

[10](...continued)

improvements to address I-81 corridor issues in their states." However, the record indicates that nothing obligates the Tier 1 FEIS to encompass efforts by other states to implement freight rail improvement projects, because there were no freight rail "proposals" in neighboring states that would trigger FHWA's NEPA responsibilities at the time the Tier 1 ROD was issued. And there is nothing that allows FHWA to compel a state, such as Tennessee, a separate sovereign from both the United States and Commonwealth of Virginia, to seek and spend discretionary federal funding for a project within its borders (such projects may or may not be eligible for Federal-Aid funding). The Federal-Aid Highways Act ("FAHA"), 23 U.S.C. 101, *et seq.*, provides the statutory basis for the Federal-Aid Highway Program of financial assistance to states for transportation construction and improvements. FAHA provides that "[t]he authorization of the appropriation of federal funds or their availability for expenditure . . . shall in no way infringe on the sovereign rights of the States to determine which projects shall be federally financed." 23 U.S.C. § 145(a); *see also Taubman Realty Group Ltd. Partnership v. Mineta*, 198 F. Supp. 2d 744, 752 (E.D. Va. May 3, 2002), *aff'd by* 320 F.3d 475 (4th Cir. 2003).

-22-

F.2d 1289, 1299 (8th Cir. 1976)). "An administrative process can never come to an end if the process must begin again every time new information is available." *Piedmont Heights Civic Club, Inc. v. Moreland*, 637 F.2d 430, 442 (5th Cir. 1981) (citing *Vermont Yankee Nuclear Power Corp., v. Natural Resources Defense Council*, 435 U.S. 519, 555 (1978)).

Plaintiffs would require Defendants to stall all the Tier 1 decisions in order to consider the outcome of the I-81 Freight Rail Study, which is as of yet still incomplete, with no expected completion date. This is not only contrary to NEPA and case law, but is unreasonable in light of existing studies concluding that rail is simply not a viable solution for the problems identified in the I-81 Study. "The problem with this approach is that such will be the case in all projects authorized by Congress and an adoption of this position would result in an endless cycle of study and conflict among the experts. All that is required by NEPA is that the decision-maker formulate an informed decision based upon 'available data.'" *Conservation Council of North Carolina v. Froehlke*, 435 F. Supp 775, 793 (M.D. NC. July 28, 1977). So long as "[t]he pendency of the study was fully disclosed . . . no more is required by NEPA." *South Louisiana Environmental Council*, 629 F.2d at 1017. There is no question that the pendency of the Freight Rail Study was disclosed in both the Tier1 FEIS and the ROD. The elimination of multi-state rail because of its inability to eliminate the need for improvements to I-81 is well-reasoned and was based on careful consideration of the Reebie Study and confirmed by Tier 1 traffic analyses. Therefore, it cannot be categorized as arbitrary.

## C.

The Federal-Aid Highways Act, 23 U.S.C. 101, *et seq.*, provides the statutory basis for the Federal-Aid Highway Program of financial assistance to states for transportation construction and improvements. Section 139(*l*) is a statute of limitations intended by Congress to be of exact

-23-

scope to bar any purported challenge to a federal agency action for which notice has been given in the Federal Register. Congress enacted the current transportation reauthorization bill, the Safe, Accountable, Flexible, Efficient Transportation Equity Act: A Legacy for Users, Public Law 109-59 ("SAFETEA-LU"), on August 10, 2005. In section 6002 of SAFETEA-LU, codified at 23 U.S.C. § 139(*l*), Congress facilitated the construction of federal-aid highway projects by mandating that any legal challenges to final decisions and approvals rendered pursuant to NEPA and other Federal laws were barred once 180 days have passed after notice of a final agency action is published in the Federal Register. The statute provides as follows:

> Limitations on Claims.—
>
> (1) In general.--Notwithstanding any other provision of law, a claim arising under Federal law seeking judicial review of a permit, license, or approval issued by a Federal agency for a highway or public transportation capital project shall be barred unless it is filed within 180 days after publication of a notice in the Federal Register announcing that the permit, license, or approval is final pursuant to the law under which the agency action is taken, unless a shorter time is specified in the Federal law pursuant to which judicial review is allowed. Nothing in this subsection shall create a right to judicial review or place any limit on filing a claim that a person has violated the terms of a permit, license, or approval.
>
> (2) New information.--The Secretary shall consider new information received after the close of a comment period if the information satisfies the requirements for a supplemental environmental impact statement under section 771.130 of title 23, Code of Federal Regulations. The preparation of a supplemental environmental impact statement when required shall be considered a separate final agency action and the deadline for filing a claim for judicial review of such action shall be 180 days after the date of publication of a notice in the Federal Register announcing such action.

Prior to the enactment of section 139(*l*), the general six year statute of limitations, as applied in all APA claims, was the relevant limitations period for a challenge to a NEPA decision. *See Sierra Club v. Penfold*, 857 F.2d 1307, 1315 (9th Cir. 1988); *Humane Society of the United*

-24-

*States v. Hodel*, 840 F.2d 45, 50 (D.D.C. 1988); *see also* 28 U.S.C. § 2401(a); *Sierra Club v. Slater*, 120 F.3d 623 (6th Cir. 1997).

Plaintiffs contend that Defendants' invocation of the 180-day SOL was an improper attempt to circumvent NEPA by barring them from challenging the Tier 1 decisions until the conclusion of Tier 2 studies. However, the decision to invoke the 180-day SOL appears to be not an attempt to bar judicial review of future studies and future decisions, but merely to establish a limitations period during which parties could challenge Tier 1 final agency actions, including decisions relating to mode choice and corridor location. Final agency decisions made at the close of a Tier 1 NEPA process are reviewable at the time the decision is rendered. Indeed, "plaintiffs need not wait to challenge a specific project when their grievance is with an overall plan." *Salmon River Concerned Citizens v. Robertson*, 32 F.3d 1346, 1355 (9th Cir. 1994). "[I]f the agency action only could be challenged at the site-specific development stage, the underlying programmatic authorization would forever escape review. To the extent that the plan pre-determines the future, it represents a concrete injury that plaintiffs must, at some point, have standing to challenge. That point is now, or it is never." *Idaho Conservation League v. Mumma*, 956 F.2d 1508, 1516 (9th Cir. 1992).

The SOL notice governs challenges to the Tier 1 NEPA proceedings, which resulted in approvals on several fundamental issues. As expressed in the tier 1 ROD, Defendants do not expect to revisit these fundamental issues during Tier 2 proceedings "unless substantial new information arises that is material to these decisions." It was appropriate for FHWA to invoke the 180-day SOL because the detailed work in Tier 2 can be accomplished effectively only if that work can rely on certain key decisions made, including those regarding mode choice and corridor location, in the Tier 1 FEIS and ROD. Finality of the Tier 1 decisions is crucial to

-25-

permit timely implementation of the much-needed independent safety and operational improvement projects that also have been advanced to Tier 2. It is clear that the Tier 1 ROD anticipates that Tier 1 decisions may have to be revisited if site-specific Tier 2 impacts analyses show that the variable-lane widening alternatives under consideration within a specific SIU are environmentally unfeasible. S*ee Hoosier Environmental Council v. U.S. Dept. of Transp.*, Civil Action No. 1:06-cv-1442, 2007 WL 4302642 at *8 (S.D. Ind. December 10, 2007). And the Tier 1 ROD reflects that other environmental laws and regulations may require the reconsideration of alternatives. In fact, the parties agree that the Tier 1 decision will be reconsidered on the basis of substantial, new, and material information, and that the SOL notice does not exclude from further review any Tier 1 decisions that merit reconsideration at Tier 2 on the basis of such information. The Tier 1 FEIS and ROD explain that the selected variable-lane widening concept advanced will appropriately narrow the range of alternatives under consideration at Tier 2, and the SOL notice fully complies with FHWA's guidance for issuing such notices. The SOL notice refers readers to the Tier 1 FEIS and ROD for further information concerning the Tier 1 decisions. Taken together, the SOL Notice, the Tier 1 FEIS, and the ROD provide sufficient notice that the Tier 1 decisions will be advanced and form the basis of Tier 2 analyses, as well as a statement of the reasons supporting rejections of alternate corridor-length improvement concepts from further study.

As required by SAFETEA-LU, FHWA and the Federal Transit Administration issued joint guidance on the environmental review process. The guidance explains that publication of an SOL notice is appropriate for Tier 1 decisions that the "agency does not expect to revisit during Tier 2 proceedings in the absence of substantial new and relevant information that may affect the outcome of the agency's decision." Tier 1 decisions that may be appropriately covered

-26-

by a SOL notice include corridor location, modal choice, alternatives to be eliminated from detailed analysis, and jurisdictional determinations made under Federal law. Tier 1 RODs for which SOL notices are published should describe the decisions that are final within the meaning of 23 U.S.C. § 139(*l*). The guidance suggests as an example, but does not mandate, that Tier 1 alternatives eliminated from Tier 2 study be listed using the same names and alternative numbers that are used in the FEIS. The guidance also suggests that a more effective practice may be to include a section in the Tier 1 ROD that summarizes the specific Tier 1 decisions and provide a reference to that section of the ROD in the SOL notice. The SOL notice issued in this case not only provided a reference to the Tier 1 ROD, where the final decisions are fully described, but it also referred to the Tier 1 FEIS and a Web-site address where interested parties could download copies of both documents. The Tier 1 ROD clearly and appropriately incorporates by reference the FEIS and, reading the documents together, they fully disclose the Tier 1 decisions that were made. The SOL notice provided the name, address, telephone number, and email address for FHWA's and VDOT's I-81 Project Managers if interested parties wished to ask questions, seek clarification, or request documents from the I-81 Study files. Therefore, Defendants complied with FHWA's SAFETEA-LU Guidance regarding SOL notices for tiered NEPA documents.

Finally, I am not persuaded by Plaintiffs' contention that the SOL notice deprives them of "their rights to seek judicial review of legal sufficiency of Tier 2 NEPA Studies in violation of the Due Process Clause." The Fifth Amendment protects individuals from deprivations of "life, liberty, or property, without due process of law," and procedural due process imposes constraints on governmental decisions which deprive individuals of those protected interests. U.S. Const. amend. V; *Mathews v. Eldridge*, 424 U.S. 319, 332, 96 S.Ct. 893, 901 (1976). The Court's consideration of a procedural due process claim is the same under both the Fifth and Fourteenth

Case 3:07-cv-00066-NKM-BWC   Document 85   Filed 09/03/09   Page 27 of 29   Pageid#: 658

Amendments of the Constitution. *U.S. v. Bohn*, 281 Fed. App. 430, 435 n.4 (6th Cir. 2008) (citing *Medical Mut. v. deSoto*, 245 F.3d 561, 575 (6th Cir. 2001); *Rep. of Pan. v. BCCI Holdings (Lux.) S.A.*, 119 F.3d 935, 944 (11th Cir. 1997)); *Springs v. Stone*, 362 F.Supp.2d 686, 700 n.9 (E.D. Va. 2005). To establish a Fifth Amendment due process claim, a plaintiff must show that he or she was deprived of a protected interest without the appropriate level of process. *Palmer v. City Nat. Bank of West Virginia*, 498 F.3d 236, 248 (4th Cir. 2007); *Elmco Props., Inc. v. Second Nat'l Fed. Sav. Ass'n*, 94 F.3d 914, 920 (4th Cir. 1996) (citing *Board of Regents v. Roth*, 408 U.S. 564, 571 (1972)).

The record before me indicates that the requirements of due process were met, given that there was adequate notice and Defendants conducted hearings so as to allow meaningful public comment. *See, e.g., Southeast Legal Defense Group v. Adams*, 657 F. 2d 1118, 1125 (9th Cir. 1981). The SOL notice advises the public that Defendants have made final Tier 1 decisions, and explains the 180-day limit on filing a claim seeking judicial review. It refers the public to a Tier 1 FEIS and ROD which describe, *inter alia*, the improvement concepts to be advanced. The SOL notice informs the public where to find the Tier 1 documents online and whom to contact if they have questions. The SOL notice is sufficient to meet the requirements of 23 U.S.C. §139(*l*)(1). There is no practical or legal mandate requiring the agencies to include the entirety of any report or study in the public notice. An informative synopsis such as that used in this case, in conjunction with references to the pertinent NEPA documents, complies with the law and FHWA guidance on issuing the SOL notice.[11]

---

[11] Plaintiffs have pleaded their due process claims under 42 U.S.C. § 1983. Section 1983 "is a federal statutory remedy available to those deprived of rights secured to them by the Constitution and, in a more sharply limited way, the statutory laws of the United States." *Phillips v. Pitt County Mem. Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009). "One alleging a violation of section 1983 must prove that the charged state actor (1) deprived plaintiff of (continued...)

Case 3:07-cv-00066-NKM-BWC   Document 85   Filed 09/03/09   Page 28 of 29   Pageid#: 659

# IV.

For the stated reasons, Defendants' motion for summary judgment (docket no. 64) will be granted, Plaintiffs' motion for summary judgment (docket no 59) will be denied, and this case will be stricken from the active docket of the Court.

The Clerk of the Court is hereby directed to send a certified copy of this Memorandum Opinion and the accompanying Order to all counsel of record.

Entered this _3rd_ day of September, 2009.

NORMAN K. MOON
UNITED STATES DISTRICT JUDGE

---

[11](...continued)
a right secured by the Constitution and laws of the United States, and (2) that the deprivation was performed under color of the referenced sources of state law found in the statute." *Id.* (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 150 (1970)); *see also American Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49-50 (1999); *Lytle v. Doyle*, 326 F. 3d 463, 471 (4th Cir. 2003). Furthermore, Plaintiffs must show that the actions were undertaken by a "person" acting under color of state law. *See Will v. Michigan Dept. of State Police*, 491 U.S. 58, 71 (1989). Although Plaintiffs have made broad allegations under §1983 in their complaint, such allegations fail under the pleading standard established by *Bell Atlantic v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 129 S.Ct. 1937 (2009). *See also* Fed.R.Civ.P. 12(b)(6). Plaintiffs must allege facts that "state a claim to relief that is plausible on its face" and that "nudges [their] claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570. A claim is plausible if the complaint contains "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," and if there is "more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 129 S. Ct. at 1949. Section 1983 has no application to the FHWA or its officers. *District of Columbia v. Carter*, 409 U.S. 418, 424-25 (1973). Moreover, the Commonwealth is not a proper party under §1983 because it is not a "person" within the meaning of the statute, and the amended complaint fails to allege that there have been any actions or involvement by the individual interveners in the challenged actions. Nor does the complaint allege that the Commonwealth or the federal Defendants acted under color of state law.

-29-